AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
6947 Gloria Drive
Cincinnati, Ohio 45239

)
)
)
)
)

Case No. 1:21-MJ-00851

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____Ohio_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A5 (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before ___November 29, 2021___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Hon. Stephanie K. Bowman or Hon. Karen L. Litkovitz___ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   **5:28 PM, Nov 15, 2021**

*Stephanie K. Bowman*
*Judge's signature*

City and state:   Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

## Return

| Case No.:<br>1:21-MJ-00851 | Date and time warrant executed:<br>11/16/2021 6:05 AM | Copy of warrant and inventory left with:<br>VIE ADAMS |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

See attached FD-597

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 11/23/2021

_Anthony C. Ott_
*Executing officer's signature*

_Anthony C. Ott - SA_
*Printed name and title*

FD-597 (Rev. 4-13-2015)

Page __1__ of __1__

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: 245D-CI-2213497

On (date) 11-16-2021

item (s) listed below were:
- ☒ Collected/Seized
- ☐ Received From
- ☐ Returned To
- ☐ Released To

(Name) Vie Adams

(Street Address) 6947 Gloria Dr. Cincinnati, Ohio 45239

(City) Cincinnati

Description of Item (s):

1. White IPhone w/ Brown Case
2. Black IPhone - no case
3. Mint Green IPhone - no case
4. Black IPhone w/ Black Case
5. Bag w/ Green Leafy Substance
6. Bottle w/ White Tablets (M Stamp)
7. Digit Z Digital Scale w/ White Residue
8. Matrix Digital Scale
9. Silver Pill Crusher w/ White Residue
10. Taylor Digital Scale
11. Black IPhone w/ Black Case
12. Silver IPhone w/ Cracked Case
13. 9mm Magazine
14. 35 Rounds 9mm
15. Asus Laptop - Black
16. Acer Model Spire 5851-1513 Serial LXPWJO20010201 2HFC16D1
17. Bulk Cash - U.S. Currency

Received By: _____
(Signature)

Printed Name/Title: Tustin Weekley, Speed Agent

Received From: _____
(Signature)

Printed Name/Title: Vie Adams, Homeowner

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>6947 Gloria Drive<br>Cincinnati, Ohio 45239 | )<br>)<br>)<br>)<br>)<br>)<br>Case No. 1:21-MJ-00851 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A5 (incorporated by reference).

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | Conspiracy to Possess with Intent to Distribute and Distribute Fentanyl |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Anthony C. Ott, Special Agent FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ FaceTime Video Conference _____ *(specify reliable electronic means)*.

Date: **Nov 15, 2021**

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Anthony C. Ott, being duly sworn hereby and state as follows:

**INTRODUCTION**

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Cincinnati, Ohio Field Office Division, and have been so employed since October 2000. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. The Attorney General of the United States has empowered me with Title 21 authority, which authorizes me to seize property, conduct search warrants, and make arrests of persons for violations of the Controlled Substances Act.

2.  I am currently assigned to investigate matters involving violent crimes, violent crimes against children, organized crime, criminal enterprises, and narcotics to include the unlawful possession, possession with intent to distribute, and actual distribution of controlled substances. As a Special Agent, I have participated in the preparation and execution of Federal arrest and search warrants related to numerous criminal offenses, including those involved in the current investigation. I have also been involved with the analysis of pen registers, the monitoring of Title III wire intercepts, and the installation and monitoring of tracking devices for vehicles in relation to narcotics investigations. Further, I have been the affiant and obtained numerous Federal warrants for the cell phone data location of fugitives and subjects under investigation by the FBI.

3.  In my experiences I have had the opportunity to monitor, listen, and review transcripts pertaining to communications which involved the trafficking of illegal narcotics by persons who attempted to thwart law enforcement by speaking in coded language. I have also

participated in numerous post arrest and proffer interviews of individuals with knowledge of illegal drug trafficking that had been involved in using coded language and were familiar with day to day operations utilized by those involved in the illegal trafficking of narcotics. Through these interviews and other investigative experiences, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of conducting their criminal activities.

4.     In addition, I have utilized confidential informants, pen registers, toll records, physical surveillances, and electronic surveillances in the process of my investigations to further my knowledge regarding the operations of those involved in illegal narcotics distribution. I have further been the affiant on Federal search warrants, have testified in Grand Jury proceedings, and have written reports during the course of conducting investigations.

5.     Through my training, experiences, and communications with other experienced agents and officers who conduct drug investigations, I have become familiar with methods used by drug traffickers to import, transport, store, collect, and safeguard illegal narcotics. Additionally, my training and experiences have given me knowledge regarding the methods used by drug traffickers to communicate with each other, to launder drug proceeds, and to thwart efforts by law enforcement to detect their illegal activities. I also have gained intelligence through my experiences, and through conversations with others who have conducted drug-related investigations, in regard to methods by which drug traffickers package, prepare, and distribute narcotics.

6.     Facts set forth in this affidavit are based on personal knowledge derived from my participation in this investigation and upon information presented to me by other law enforcement officers involved in this case to include fellow agents of the DEA, Ohio Bureau

of Criminal Investigation, the Drug Abuse and Reduction Task Force (DART), Hamilton County Regional Enforcement Narcotics Unit (RENU), Cincinnati Police Department (CPD), Hamilton County Probation Office, Butler County Undercover Regional Narcotics Unit (BURN) and other law enforcement agencies. The sources of my information and beliefs include: (1) oral and written reports about this and other investigations which I have received from fellow law enforcement agencies; (2) physical and electronic surveillance conducted by Special Agents of the FBI and/or other law enforcement authorities which have been reported to me either directly or indirectly; (3) interviews of subjects, witnesses, victims, and confidential sources; (3) search warrants of residences, vehicles, and cell phones; and (3) law enforcement controlled drug buys.

7.      Since this affidavit is being submitted for the limited purpose of establishing probable cause authorizing search and seizure, I have not included each and every fact and circumstance I am aware of. I have set forth only those facts which I believe are necessary to establish such probable cause.

## PURPOSE OF THE AFFIDAVIT

8.   This affidavit is submitted in support of an application for search warrants for evidence, contraband, fruits, and instrumentalities of crime, persons to be arrested, property used or intended to be used in the commission of crime(s) and search and seizure of digital devices located at the subject premises and surrounding curtilage, related to evidence of a conspiracy to possess with intent to distribute and distribute heroin, fentanyl, methamphetamine, cocaine, and/or other controlled substances in violation of 21 U.S.C. § 846; possession with intent to distribute the same in violation of 21 U.S.C. § 841(a)(1).

9.   For all the reasons articulated below, I have probable cause to believe that evidence related

to these crimes will be located within the following locations, which are more fully described in

**Attachments A1 through A5** (attached hereto and incorporated herein by reference):

     a.  6300 Witherby Avenue, Cincinnati, Ohio 45224 (hereinafter **SUBJECT PREMISE A1**). I believe Jerome NEWTON is living at and storing drugs and drug proceeds in **SUBJECT PREMISE A1**. I believe that evidence of NEWTON and DANIEL's drug trafficking activities will be found at **SUBJECT PRESMISE A1.**

     b.  3545 Jessup Road, Apartment 1B, Cincinnati, Ohio 45239 (hereinafter **SUBJECT PREMISE A2**). I believe NEWTON and Jimmy DANIEL are using **SUBJECT PREMISE A2** to store illegal drugs. I believe evidence of NEWTON and DANIEL's drug trafficking activities will be found at **SUBJECT PREMISE A2**.

     c.  6076 Yosemite Drive, Cincinnati, Ohio 45237 (hereinafter **SUBJECT PRESMISE A3**). I believe NEWTON's girlfriend is residing at **SUBJECT PREMISE A3** and NEWTON is storing illegal drug proceeds at **SUBJECT PREMISE A3**. I believe evidence of NEWTON's drug trafficking activities will be found at **SUBJECT PREMISE A3**.

     d.  1314 Telford Avenue, Cincinnati, Ohio 45224 (hereinafter **SUBJECT PREMISE A4**). I believe that DANIEL is living at and storing drugs and drug proceeds at **SUBJECT PREMISE A4**. I believe evidence of DANIEL's drug trafficking activities will be found at **SUBJECT PREMISE A4**.

     e.  6947 Gloria Drive, Cincinnati, Ohio 45239 (hereinafter **SUBJECT PREMISE A5**). I believe ██████████ DANIEL's girlfriend, is living at **SUBJECT PREMISE A5** and is assisting NEWTON and DANIEL in their drug trafficking activities. I believe NEWTON and DANIEL are storing illegal drugs in **SUBJECT PREMISE A5**. I believe evidence of NEWTON and DANIEL's drug trafficking activities will be found in **SUBJECT PREMISE A5**.

## PROBABLE CAUSE

10. The following statement of facts and circumstances detail the involvement of certain individuals in drug trafficking and the use of the **SUBJECT PREMISES** to facilitate those drug trafficking activities. Based on my training and experience, my participation in this investigation as well as information I believe to be reliable based on oral and written reports about this investigation and other investigations, physical surveillance conducted by federal and/state law enforcement agencies, telephone toll records and subscriber information, location data obtained from GPS tracking devices, public records, and law enforcement databases, I know the following:

**A. Investigation Overview: Jerome NEWTON and Jimmy DANIEL distribute fentanyl in Cincinnati, Ohio**

11. In October 2018, FBI Cincinnati, FBI Pittsburgh, DEA Cincinnati, Cincinnati Police Department (CPD), Hamilton County Regional Enforcement Narcotics Unit (RENU) and the Drug Abuse and Reduction Task Force (DART) initiated a multi-agency joint investigation into the ROBERSON Drug Trafficking Organization (DTO) based in Cincinnati, Ohio. Multiple sources of information provided information that the ROBERSON DTO's primary source of revenue is the storage, production, distribution, and transportation of heroin/fentanyl. The mixture of heroin and fentanyl is a highly addictive and dangerous opioid narcotic, use of which can lead to a fatal overdose death. Per sources of information, the ROBERSON DTO has been selling large amounts of heroin/fentanyl for over five years throughout the greater Cincinnati, Ohio area.

12. Through multiple confidential informant interviews, proffer interviews, cooperating defendant interviews, and telephone toll analysis, investigators have determined the ROBERSON DTO is led by Steffen ROBERSON a/k/a "Worm" who is from Cincinnati. ROBERSON is alleged to coordinate the distribution of multi-kilogram quantities heroin/fentanyl throughout the ROBERSON DTO sub-cells which primarily operate throughout the greater Cincinnati, Ohio area. One of the sub-cells is led and organized by Jerome NEWTON Jr. a/k/a "Rome" and/or "Kodak" and his partner Jimmy DANIEL III a/k/a "Neutron."

13. In late 2017, FBI Pittsburgh arrested and dismantled a significant, Mexico-based, large scale Drug Trafficking Organization (DTO) which resulted in the seizure of approximately $1.1 million dollars and 52 kilograms of narcotics. During post-arrest and proffer interviews of several of the DTO's cooperating defendants, agents learned that the DTO had sold the ROBERSON DTO approximately 24 kilograms of heroin throughout 2017. Furthermore, NEWTON was involved and present when ROBERSON purchased kilograms of heroin to distribute through the

5

ROBERSON DTO.

14. NEWTON has a criminal history which includes a 2014 felony conviction for Trafficking a Controlled Substance, Possession of Drugs, Illegal Conveyance into Detention Facility. NEWTON was sentenced to 12 months confinement.

15. DANIEL has a criminal history which includes felony convictions for: Possession of Drugs (2008), Having Weapons Under Disability and Possession of Drugs (2010), Trafficking in Drugs (2013), Trafficking in Drugs (2014), Receiving Stolen Property and Having Weapons Under Disability (2017).

16. In January 2020, FBI Cincinnati and the Cincinnati Police Department, District 5, Violent Crime Squad acquired three separate confidential informants who conducted eight law enforcement controlled purchases of Crack Cocaine and Heroin Fentanyl from NEWTON and DANIEL from January through March 2020. These eight controlled purchases were arranged through an informant contacting NEWTON or DANIEL by telephone call. During these phone calls, NEWTON and/or DANIEL would arrange for the informant to meet them at a specific meeting location in order to conduct the narcotics transaction. These transactions were overseen by law enforcement with a physical surveillance conducted during the controlled purchases as well as a search of the informant before and after each controlled purchase of narcotics. The fentanyl NEWTON and DANIEL sold to informants in 2020 tested positive for fentanyl at the Hamilton County Crime Laboratory.

17. During the execution of the approximately eight law enforcement controlled purchases of narcotics, investigators identified three main residences used by NEWTON and DANIEL for their operations in 2020: 5887 Monfort ███ Avenue, Apartment 1, Cincinnati, Ohio 45239; 1314 Telford Avenue (still in use, **SUBJECT PREMISE A4**) Cincinnati, Ohio 45224; and 2008A

Benton Road, Covington, Kentucky, 41011. On or around April 9, 2020, federal search warrants were executed at these residences which resulted in the recovery of approximately 130 grams of fentanyl and five firearms. The fentanyl was tested at the Hamilton County Crime Laboratory and tested positive as fentanyl. Following the execution of warrants, agents continued the investigation into NEWTON and DANIEL and their involvement with the ROBERSON DTO.

18. On September 27, 2020, ███████████ was found deceased in Owenton, Kentucky from an opioid overdose. A search of the ███████ cell phone by law enforcement yielded the subject name of "GEE" with telephone numbers 513-773-9293 and 513-417-2157 in ███████ phone that appeared to be providing the fentanyl to ███████ that he overdosed on. Based on call log information and text messages it appeared that "GEE" and ███████ met on the evening of Saturday, September 26, 2020 to conduct a drug transaction. ███████ called "GEE" at 513-417-2157 nine (9) times on 9/26 between 3:46 PM and 6:47 PM. In addition, a text message on September 26, 2020 at 4:09 p.m. from ███████ to GEE on his 513-417-2157 cell phone, ███████ asks for a "g" (a "g" is common drug trafficking language for purchasing a gram "g" quantity of heroin/fentanyl). Previous text messages between ███████ and GEE at 513-417-2157 also showed them setting up times to meet up.

19. FBI Covington RA conducted a routine FBI database search which showed that "GEE's" telephone number of 513-417-2157 was a known telephone number for Jerome NEWTON Jr. who is also known to use the alias "GEE" and was being investigated by FBI Cincinnati and other law enforcement agencies for drug trafficking. Investigators had previously conducted multiple law enforcement controlled heroin/fentanyl purchases involving NEWTON who was using the same telephone number 513-417-2157 that ███████ had been communicating with to purchase the fentanyl.

7

20. In or around July 2021, FBI Cincinnati and the Hamilton County Sheriff's Office RENU developed a reliable Cooperating Defendant (hereafter CD-1) and two separate reliable confidential informants (hereafter CHS-1 and CHS-2) who have provided information on NEWTON and DANIEL's drug trafficking operations and conducted multiple law enforcement controlled purchases of fentanyl from NEWTON and DANIEL from July through November 2021.

21. CD-1[1] advised that Jerome NEWTON acquired a Mexico based source of drug supply that NEWTON's brother ███████████ was managing before he was shot and killed in January 2021. CHS-1 stated that NEWTON has access to as many kilograms of cocaine and fentanyl from his source of supply that NEWTON is able to distribute. Steffen ROBERSON a/k/a "Worm" has a $200,000 debt to NEWTON for kilograms of narcotics ROBERSON has received from NEWTON. CD-1 identified Jimmy DANIEL a/k/a "Nuetron" and Shawn BARTON as two of the main drug trafficking associates working under NEWTON.

22. CHS-1[2] advised that Jerome NEWTON and Jimmy DANIEL are working together selling narcotics. NEWTON is acquiring multi-kilogram quantities of fentanyl and cocaine from a Mexico based drug supplier. Some of the drug loads NEWTON is receiving are up to 40 kilograms of fentanyl and cocaine in total quantity.

23. In October 2021, CHS-2[3] provided that NEWTON was acquiring and distributing multi-

---

[1] CD-1 is currently charged with ███████████████████████ and is cooperating with law enforcement in the hopes of receiving a lighter sentence. CD-1 has previously been convicted of ████████████████ To date, further investigation has corroborated information provided by CD-1 and has not shown any material information provided by CD-1 to be inaccurate. Therefore, I believe information provided by CD-1 is reliable.

[2] CHS-1 is cooperating with law enforcement for financial consideration. CHS-1 has previously been convicted of ████████████████████████ To date, further investigation has corroborated much of the information provided by CHS-1 and has not shown any material information provided by CHS-1 to be incorrect. Therefore, I consider information provided by CHS-1 to be reliable.

[3] CHS-2 is currently charged with the following offenses: ████████████████████████ ███████████████████ CHS-2 has previously been convicted of ████████████████ ████████████ To date, investigation has corroborated much of the information provided by CHS-2 and has not shown any material information provided by CHS-2 to be incorrect. Therefore, I believe the information provided by CHS-2 to be reliable.

kilogram quantities of fentanyl directly from a Mexican source of supply that goes by the alias "Altas." CHS-2 identified NEWTON's drug trafficking partner as DANIEL. CHS-2 provided investigators with a video where NEWTON shows off "$300,000" in cash. CHS-2 also said that ROBERSON owes NEWTON a large amount of money for drugs ROBERSON acquired from NEWTON. CHS-2 identified the residences NEWTON and DANIEL are using to facilitate their drug trafficking operations as: **SUBJECT PREMISES A2, A4,** and **A5**.

**B. Probable Cause for SUBJECT PREMISES A1 through A3**

24. From September 1, 2021 through November 14, 2021, agents used CD-1 and CHS-1 to make law enforcement controlled purchases of fentanyl from NEWTON and DANIEL and Shawn BARTON. The specific dates, dollar amounts, and quantities of narcotics purchased are limited in this affidavit to help prevent members of the ROBERSON DTO from identifying the Confidential Sources and conducting acts of violence and intimidation.

25. During the time frame of September 1 through November 10, 2021, CD-1 and CHS-1 conducted approximately six law enforcement-controlled drug buys directly from NEWTON, DANIEL and Shawn BARTON. During all of the controlled buys, the confidential informants would be searched before and after the controlled buy for contraband and would be provided with an amount of pre-recorded U.S. currency in order to conduct the purchase of the narcotics.

26. During the timeframe of October 1 through October 14, 2021, agents used CHS-1 to make a controlled buy of fentanyl from NEWTON. Prior to the controlled buy, physical and electronic surveillance showed that NEWTON had stayed overnight at **SUBJECT PREMISE A1**. After CHS-1 called NEWTON to arrange for the controlled buy, surveillance showed that NEWTON traveled from **SUBJECT PREMISE A1** to **SUBJECT PREMISE A2.** NEWTON was at

**SUBJECT PREMISE A2** for a short time before returning to **SUBJECT PREMISE A1**. Investigators believe NEWTON acquired the drugs sold to CHS-1 at **SUJBECT PREMISE A2.** NEWTON returned to **SUBJECT PREMISE A1** for a short time before leaving the location and traveling to meet CHS-1. At the pre-determined meeting location, NEWTON sold CHS-1 fentanyl in exchange for the pre-recorded U.S. Currency. The fentanyl NEWTON sold CHS-2 tested positive for fentanyl. After the transaction, surveillance units observed NEWTON travel directly to **SUBJECT PREMISE A3**. Based on my training and experience, and my participation in this investigation, I believe that NEWTON traveled to **SUBJECT PREMISE A2** to retrieve the fentanyl that he sold to CHS-1. I am aware that drug traffickers commonly store drugs and drug proceeds in locations that are separate from their primary residences to evade law enforcement detection. As such, I believe NEWTON is using **SUBJECT PREMISE A2** as a location to store fentanyl and that NEWTON is using **SUBJECT PREMISE A3** to store the drug proceeds.

27. During the timeframe of October 15 through November 12, 2021, agents used CHS-1 to make a controlled buy of fentanyl from NEWTON. Physical and electronic surveillance showed that NEWTON traveled directly from **SUBJECT PREMISE A1** to the pre-determined meeting location. At the meeting location, NEWTON sold CHS-1 an amount of fentanyl in exchange for pre-recorded U.S. Currency. The fentanyl NEWTON sold to CHS-1 tested positive for fentanyl. Immediately after the controlled buy, NEWTON traveled directly to **SUBJECT PREMISE 3**. Based on my training and experience, and my participation in this investigation, I believe that NEWTON is storing drug proceeds at **SUBJECT PREMISE A3**.

28. On October 20, 2021, a court authorized GPS location of NEWTON's cellular telephone showed NEWTON travel from Cincinnati, Ohio to Detroit, Michigan by vehicle and then return to Cincinnati, Ohio on the following evening of October 21, 2021. Physical surveillance units saw

NEWTON and a Hispanic male arrive at **SUBJECT PREMISE A2**. NEWTON and the unidentified male entered the building. GPS Location information showed that NEWTON traveled directly from Detroit to **SUBJECT PREMISE A2**, which as described above, I believe to be NEWTON's primary stash location where he stores drugs. Shortly after NEWTON arrived, surveillance units saw DANIEL's vehicle arrive and park in front of **SUBJECT PREMISE A2**. A short time later, a female that is believed to be DANIEL'S girlfriend, ██████████ exited **SUBJECT PREMISE A2** wearing a large backpack. ██████ got into the passenger seat of a white 2016 Acura ILX sedan, registered to ██████████ and the vehicle departed from **SUBJECT PREMISE A2**. I believe DANIEL was the driver of the vehicle, because the white 2016 Acura ILX sedan, registered to ██████████ is known by investigators to be DANIEL's primary vehicle that he regularly uses and drives. In addition, in or around October or November 2021, investigators have purchased fentanyl directly from DANIEL and DANIEL delivered the narcotics while driving the same white 2016 Acura ILX sedan.

29. Based on court authorized GPS location data from NEWTON's cell phone and physical surveillance, the unidentified Hispanic male then appeared to drive NEWTON to an unknown location and drop NEWTON off. Surveillance units later saw the unidentified male parking the vehicle at the Cancun Mexican Restaurant on Cheviot Road and going inside. Physical surveillance units at the restaurant saw the unidentified male having phone conversations with other individuals on his cellular telephone in both Spanish and English. After leaving the restaurant, agents saw the unidentified male drive the vehicle that is registered to NEWTON's girlfriend ██████ from the Cancun Restaurant to **SUBJECT PREMISE A2**. ██████ lives at **SUBJECT PREMISE A1**,

30. During this time, court authorized phone location information showed that both NEWTON's phone and vehicle were located at **SUBJECT PREMISE A1**. NEWTON's phone

location information and court authorized GPS tracker on his vehicle then showed NEWTON left **SUBJECT PREMISE A1**. NEWTON made several short stops before arriving at **SUBJECT PREMISE A2**, where NEWTON stayed for approximately 25 minutes.

31. During this time ███████████ vehicle that she drives, a black 2015 Nissan Altima, was observed departing from 6300 Witherby Ave (**SUBJECT PREMISE A1**). NEWTON then left **SUBJECT PREMISE A2** and drove directly to a luxury apartment in the Arbors of Anderson where NEWTON spent the night. ███████████ vehicle had been observed in the morning hours at her residence which is **SUBJECT PREMISE A5.**

32. On October 23, 2021, investigators received information from a confidential source that NEWTON had received a large amount of fentanyl to distribute from a fresh drug resupply. Based upon my training, experience, and knowledge gained throughout the investigation, I believe that on October 20, 2021, NEWTON traveled to Detroit, Michigan to acquire a large quantity of fentanyl and then transported the delivery to **SUBJECT PREMISE A2**. Based on my training and experience, and my participation in this investigation, I am aware that drug traffickers frequently source drugs, including fentanyl, from out-of-town suppliers and transport those drugs back to their area of distribution.

33. CHS-2 said that s/he had personally observed large quantities of fentanyl in **SUBJECT PREMISE A1** in or around October 2021. NEWTON's girlfriend ███████████ is known to also reside at **SUBJECT PREMISE A1**. ███████████ has registered four vehicles in her name for NEWTON to utilize during his drug trafficking operations. ██████ Ohio Driver's License is registered to **SUBJECT PREMISE A1**.

34. Law enforcement database checks revealed that NEWTON's sister, ███████████ and brother, ███████████ had previously provided **SUBJECT PREMISE A2** as their residence. The

Duke Energy utilities at **SUBJECT PREMISE A2** are in the name of ██████████ (deceased).

35. **SUBJECT PREMISE A3** is the residence of NEWTON's girlfriend, ██████████ ██████ previously lived with NEWTON. In April 2020 when a federal search warrant was executed on ██████ residence that she shared with NEWTON where narcotics, firearms, and cash were recovered during the search. ██████ Ohio Driver's License is registered to **SUBJECT PREMISE A3**. As described in paragraphs 26 and 27, NEWTON regularly visits **SUBJECT PREMISE A3** for short periods of time, including directly following law enforcement controlled drug purchases, consistent with the dropping off or picking up of an item.

**C. Probable Cause for SUBJECT PREMISES A4 and A5**

36. Through investigation, FBI agents identified **SUBJECT PREMISE A4** as DANIEL's primary residence. DANIEL's driver's license lists **SUBJECT PREMISE A4** as DANIEL's address. A court authorized GPS tracker of DANIEL's vehicle shows him staying overnight at and repeatedly visiting **SUBJECT PREMISE A4** for short periods of time during the day which is consistent with the dropping off or picking up of an item. The GPS tracker of DANIEL's vehicle shows DANIEL makes repeated and frequent short stops throughout the day at **SUBJECT PREMISE A4**. Based upon my training and experience, and knowledge gained through the investigation, I believe that DANIEL's is still using **SUBJECT PREMISE A4** to store smaller amounts of fentanyl in for further distribution.

37. In 2020, NEWTON and DANIEL used **SUBJECT PREMISE A4** as drug stash house. In April 2020, federal agents executed a search warrant at **SUBJECT PREMISE A4** and recovered multiple bags of fentanyl prepared for distribution, another bag of containing more than more than 70 grams of fentanyl, two digital scales, firearms, ammunition, and spoons, all consistent with drug trafficking. The fentanyl recovered from **SUBJECT PREMISE A4** was tested by the

13

Hamilton County Crime Laboratory and tested positive as more than 130 grams of fentanyl.

38. Based on my training and experience, and my participation in this investigation, I believe that NEWTON and DANIEL are using **SUBJECT PREMISE A5** to store quantities of narcotics, drug ledgers, drug-related paraphernalia and records, firearms, vehicles, and jewelry purchased with drug proceeds, and cash which are likely to be found during the execution of the search warrant. DANIEL's girlfriend, ██████████ resides at **SUBJECT PREMISE A5**. ████ ████ Ohio Driver's License is registered to **SUBJECT PREMISE A5**. And on October 21, 2021, agents saw ██████████ black 2015 Nissan Altima earlier in the day parked at **SUBJECT PREMISE A5**.

39. ██████████ has been assisting NEWTON and DANIEL throughout the investigation by registering vehicles and residences in her name. As described above, I also believe ████ helped DANIEL and NEWTON in the October 21, 2021, drug resupply where she carried a large backpack from **SUBJECT PREMISE A2** after NEWTON returned from Detroit. Court authorized GPS trackers of both DANIEL's and NEWTON's vehicles show the vehicles traveling to **SUBJECT PREMISE A5** for short periods of time several times per week, consistent with the dropping off or picking up of an item. CHS-2 identified **SUBJECT PREMISE A5** as a residence NEWTON and DANIEL are using as part of their drug trafficking operations, and further stated that CHS-2 had been to **SUBJECT PREMISE A5** while with **NEWTON.**

40. ██████████ registered DANIEL's vehicle in her name, the same vehicle DANIEL is selling fentanyl from in 2021. In 2020, while conducting law enforcement controlled drug buys from DANIEL, the vehicle DANIEL was selling drugs from was also registered to ████ ████ name. On November 12, 2021, a Duke Energy subpoena response provided that the utilities of **SUBJECT PREMISE A4** are registered to ██████████ since May 31, 2019.

14

During the investigation, FBI Cincinnati received information from an individual with in depth knowledge of ▮▮▮▮▮▮▮▮ that ▮▮▮▮▮ has a machine that she is producing fake government identification cards from and selling the fraudulent IDs to people in Ohio as well as other states. ▮▮▮▮▮▮▮▮▮ acquires legitimate people's identification information and social security numbers, who have good credit, from a car dealership. ▮▮▮▮▮ vehicle has been observed parked at **SUBJECT PREMISE A5** on multiple occasions. Based upon my training and experience, and knowledge gained through the investigation, I believe that ▮▮▮▮▮▮▮▮ is actively assisting in the drug trafficking operations of NEWTON and DANIEL, and that evidence of this activity is likely to be found in ▮▮▮▮ residence at **SUBJECT PREMISE A5**.

41. A court authorized vehicle GPS tracker of the white 2016 Acura ILX that DANIEL is driving and selling narcotics from shows DANIEL and the vehicle staying overnight almost exclusively at **SUBJECT PREMISE A4**. The vehicle is registered to ▮▮▮▮▮▮▮ who resides at **SUBJECT PREMISE A5** and drives a black 2015 Nissan Altima. The GPS tracker location of DANIEL's vehicle shows the vehicle as having travelled to **SUBJECT PREMISE A5** on eight separate occasions from October 31 through November 13, 2021. Six of the eight trips show DANIEL visiting **SUBJECT PREMISE A5** for brief periods of time of less than five minutes in duration. These trips generally spread out with a separation of two or three days in between. Based on my training and experience, and knowledge gained through the investigation, I believe that DANIEL's is using **SUBJECT PREMISE A5** as his drug stash house, and DANIEL's visits to **SUBJECT PREMISE A5** for short periods of time that are spaced out by several days is to pick up his narcotics, similarly to what NEWTON is doing with **SUBJECT PREMISE A2**. DANIEL's regularly makes short trips or more on a daily basis to and from **SUBJECT PREMISE A4** in what appears to be trips to serve narcotics to individuals his smaller

quantities of narcotics. Many of the trips are to gas station businesses for less than two minutes in duration, consistent with the selling of narcotics.

42. A review of NEWTON's court authorized vehicle GPS tracker location data, showed NEWTON visit **SUBJECT PREMISE A5** on October 17, 2021 for approximately four minutes and then again on October 27, 2021 for approximately one minute. Shortly before both of these trips to **SUBJECT PREMISE A5**, NEWTON visited **SUBJECT PREMISE A2** which is where the Hispanic male is residing and believed to be where the majority of NEWTON's kilograms of narcotics are being stored. Based upon my training and experience, and knowledge gained through the investigation, I believe that NEWTON is picking up large quantities of narcotics from **SUBJECT PREMISE A2**, and then delivering them to DANIEL's drug stash house which is ████████████████ **SUBJECT PREMISE A5.**

## ITEMS COMMON TO SEARCH AND SEIZURE

43. Based upon my training and experience, my participation in this investigation, and other drug trafficking investigations, I have reason to believe that:

   a. drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

   b. drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

   c. drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

   d. drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

   e. drug traffickers often maintain in their residences and/or business establishments

16

records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs);

f.   drug traffickers commonly use cellular phones to communicate with other members of the DTO, narcotics source of supply(s), and/or narcotics customers in furtherance of violations of the Uniform Controlled Substances Act;

g.   drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.   drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i.   drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

j.   drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

k.   drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

l.   drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns

17

and automatic weapons. These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m. it is common for drug traffickers to secrete in their vehicles items identified in the above paragraphs;

n. drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o. drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p. drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles; and

q. drug traffickers commonly secret in their residences and/or places of business, over a period of years, items such as those identified in the above paragraphs.

## <u>CONCLUSION</u>

44.     I believe the facts contained within this affidavit support probable cause to believe that NEWTON, DANIEL and others are involved in a conspiracy to possess and distribute controlled substances to include fentanyl. Based on my training, experience, discussions with other law enforcement officers/agents, and the information contained herein, I believe that probable causes exists that the items listed in **Attachment B** as evidence, contraband, fruits and instrumentalities of crime, persons to be arrested, property used or intended to be used in the commission of crime(s), related to evidence of a conspiracy to possess with intent to distribute, and distribute cocaine and fentanyl, will be found at the locations identified in **Attachments A1 through A5.**

45.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant and the attachments, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is probable cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

ANTHONY C. OTT
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 15_ day of November, 2021.
**via electronic means, specifically Facetime video.**

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A5

## Property to be searched:

### 6947 Gloria Drive, Cincinnati, Ohio 45239

The property to be searched is 6947 Gloria Drive, Cincinnati, Ohio 45239 further described as a single family residence with a red brick exterior. The residence has a white railing going up the stairs leading to the front porch as well as a white railing surrounding the front porch with white pillars. There is an attached single car garage with a white overhead door attached to the lower level of the residence. The numbers 6947 are affixed to the residence to the left of the front door. Included in the property to be searched is any outbuildings, locked safes, or vehicles located on the curtilage.



# **ATTACHMENT B**

## **Property to be seized:**

All records relating to violations of 21 U.S.C. §§ 841(a)(1), 846 (distribution of and/or possession with the intent to distribute controlled substances and conspiracy to do the same); possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) including the following:

a. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

b. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs;

c. Cellular telephones, digital telephones, car telephones, or other communications devices which evidence participation in a conspiracy to distribute controlled substances.

d. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

e. Any computer equipment, digital device, magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and any other digital device capable of accessing the internet and capable of being used to commit or further the crimes outline above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes.

f. Financial instruments purchased with currency derived from the sale of controlled substances, including travelers' checks, bonds, stock certificates, cashier's checks, and certificates of deposit;

g. Money counting machines, money wrappers and rubber bands, boxes, bags, briefcases, suitcases, or containers used to carry controlled substances;

h. Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

i. Records, items, and documents reflecting travel for the purpose of participating in drug trafficking, including airline tickets, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations;

j. Handguns, shotguns and other firearms, and ammunition, which may be used to facilitate the distribution or possession with intent to distribute controlled substances;

k. Indicia of ownership and use of the vehicles, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, keys and bank account records, registration, title, insurance, and traffic tickets;

l. Photographs or video movies of drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

m. Controlled substances, including, but not limited to, methamphetamine and/or marijuana.

n. Drug paraphernalia, which can be used to store, package, weigh, dilute, and ingest controlled substances; equipment pertaining to methamphetamine and/or marijuana, and any other supplies related to the manufacture and distribution of said controlled substances.

o. United States currency, precious metals, jewelry, financial instruments and stocks and bonds; and

p. Any locked or closed containers, to include safes or lockboxes, believed to contain any of the above listed evidence

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of cell phone or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "cell phone" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop cell phones, notebook cell phones, mobile phones, tablets, server cell phones, and network hardware.

The term "storage medium" includes any physical object upon which cell phone data can be recorded. Examples include hard disks, SIM cards and other magnetic media.